**Not for Publication**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

LUKOIL NORTH AMERICA LLC,

*Plaintiff*,

v.

RTS. 94 & 515 VERNON, L.P., FERSCH HOUSE, L.P.

*Defendants*.

Civil Action No. 16-8345 (JMV)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

In this case, Plaintiff seeks to renew leases for a gas station and abutting property. The overarching issue is whether Plaintiff may do so without reference to an overarching agreement involving an entity associated with Defendants. Currently pending before the Court are two motions to dismiss the Complaint of Plaintiff Lukoil North America LLC ("Plaintiff" or "Lukoil") filed by Defendant Rts. 94 & 515 Vernon, L.P. ("Defendant Vernon") and Defendant Fersch House, L.P. ("Defendant Fersch House") (collectively, "Defendants" or "The Vernon Landlords"). D.E. 12, D.E. 17. Defendants first move to dismiss pursuant to Fed. R. Civ. P. 12(b)(7) and 19(a) based on Plaintiff's failure to join an indispensable party. D.E. 12. Alternately, Defendants requested that the party be able to intervene. Defendants next move to dismiss under the *Brillhart-Wilton* abstention doctrine. D.E. 17. Given Defendants' reply submission concerning the failure to join an indispensable party, it appears that Defendants are focusing on the abstention argument.

The Court reviewed the parties' submissions in support and in opposition,[1] and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Defendants' motion to dismiss under the *Brillhart-Wilton* abstention doctrine is **GRANTED**, although the Court will stay the case rather than dismiss it, and Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(7) and 19(a) based on Plaintiff's failure to join and indispensable party is **DENIED** without prejudice as moot. This matter will be stayed, and administratively terminated, pending the resolution of the related state court suit.

## I. FACTUAL BACKGROUND[2]

Lukoil North America is a Delaware entity, with its principal place of business in New York, New York. Compl. at ¶ 5. Defendant Vernon is a New Jersey limited partnership, with its principal place of business in Hawthorne, New Jersey. *Id.* at ¶ 6. Defendant Fersch House is also a New Jersey limited partnership, with its principal place of business in Hawthorne. *Id.* at ¶ 7.

---

[1] Plaintiff's Complaint will be referred to hereinafter as "Compl." (D.E. 1). Defendants' brief in support of its motion to dismiss the Complaint based on failure to join an indispensable party will be referred to hereinafter as "Defs. Joinder Br." (D.E. 12). Plaintiff's brief in opposition will be referred to hereinafter as "Pl. Joinder Opp. Br." (D.E. 13). Defendants' reply brief will be referred to hereinafter as "Defs. Joinder Reply." (D.E. 16). Defendants' brief in support of its motion to dismiss the Complaint based on the *Brillhart-Wilton* abstention doctrine will be referred to hereinafter as "Defs. Abstention Br." (D.E. 17). Plaintiff's brief in opposition will be referred to hereinafter as "Pl. Abstention Opp. Br." (D.E. 20). Defendants' reply brief will be referred to hereinafter as "Defs. Abstention Reply." (D.E. 22).

[2] The factual background is taken from Plaintiff's Complaint (D.E. 1), the exhibits attached to Plaintiff's Complaint, and also from the exhibits attached to Defendants' motions to dismiss (D.E. 12, 17). When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint, *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009), and may consider "exhibits attached to the complaint and matters of public record," as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document," *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Here, Defendant attached additional documents and Plaintiff has made no objection to their authenticity. Therefore, the Court considers these documents in considering Defendants' motions.

Defendants are entities related to Shotmeyer Bros. Petroleum Corporation. ("Shotmeyer"). This case centers on whether Plaintiff may renew its leases with Defendants without being required to renew all of its leases related to a master agreement Plaintiff has with Shotmeyer. Plaintiff claims that it may renew selected leases (in addition to those with Defendants), while Defendants claim that Plaintiff must renew all the leases collectively. Shotmeyer is also the party who Defendants claim is indispensable to this matter.

Plaintiff is the tenant of a particular gasoline station located at the intersection of Routes 94 and 515 in Vernon, New Jersey (the "Vernon Station"). *Id.* at ¶ 2. The Vernon Station and an adjacent lot (the "Vernon Lot"), which houses an environmental monitoring system, together comprise the leased land (collectively, the "Vernon Property"). *Id.* Lukoil leases the Vernon Property through two leases: (1) a lease with Defendant Vernon covering the Vernon Station, and (2) a lease with Defendant Fersch House covering the Vernon Lot (collectively, the "Vernon Leases"). *Id.* at ¶ 2. The Vernon Leases were set to expire on March 31, 2017. *Id.* Lukoil seeks (1) specific performance of its renewal right to the Vernon Leases, *id.* at ¶ 36-42, and (2) a declaratory judgment declaring that the renewal of the Vernon Leases are not contingent on Plaintiff's renewal of any other leases, *id.* at ¶¶ 4, 43-51.

The history of the Vernon Leases traces back to 1985 with an agreement between Shotmeyer and Mobil Oil Corporation ("Mobil"). The agreement called for Shotmeyer to lease to Mobil a number of gasoline stations, including the Vernon Station, pending the entry of separate leases for each station. *Id.* at ¶ 13. On December 31, 1986, Mobil entered into a 10-year ground lease agreement with Henry and Charlotte Shotmeyer (the "Vernon Ground Lease"). *Id.* Defendant Vernon is the successor in interest to Henry and Charlotte. *Id.* at ¶ 15.

3

Mobil ended up entering into 27 gas station leases with Shotmeyer entities. *Id.* at Exhibit 1. Between 1986 and 2009, due to various mergers, Mobil's rights under certain leases were assigned to different parties. *See* Compl. at ¶¶ 15-21. In March 2001, Mobil assigned the Vernon Leases to Tosco Corporation ("Tosco"), a wholly-owned subsidiary of ConocoPhillips Company ("ConocoPhillips"). *Id.* at ¶ 19. Through a subsidiary in 2004, Plaintiff acquired all of the leases to the Mobil sites that were then held by ConocoPhillips. *Id.* at ¶ 20. In 2004, Plaintiff (through its entity Getty Petroleum Marketing Inc. or "Getty"), inquired as to Shotmeyer's willingness to enter into a broad, overarching deal.

As a result, in 2005, Shotmeyer executed a "Purchase Agreement and Agreement to Lease" (hereinafter the "2005 Agreement") with Getty. D.E. 17, Ex. B ("2005 Agreement"). Under the 2005 Agreement, Getty acquired all of Shotmeyer Bros.' "petroleum retail assets." The 2005 Agreement stated that the parties would simultaneously "enter into individual Lease Agreements for each Site." 2005 Agreement § D. The applicability of the 2005 Agreement to the Vernon Leases is at the center of the current dispute.

In 2009, Getty assigned the Vernon Leases to Plaintiff. Compl. at ¶ 21. In September 2011, the Vernon Lease terms were extended until March 31, 2012. *Id.* at ¶ 22. In April 2012, Plaintiff entered into additional extensions of the Vernon Leases. *Id.* at ¶ 23. These extensions renewed the terms of the Vernon Leases until March 31, 2017. *Id.*

Plaintiff indicates that in the fall of 2016, it attempted to exercise the unilateral option to renew the Vernon Leases to March 31, 2022. *Id.* at ¶ 32. On or about August 4, 2016, Plaintiff emailed Defendants and told them that Plaintiff "decided to extend [its] lease at" the Vernon Property. *Id.* at ¶ 30. Defendants' principal responded that Defendants' "position remains the same – LukOil may extend the lease for all sites but not pick and choose individual locations that

serve their interest." *Id.* at ¶ 31. On or about September 16, 2016, Plaintiff sent a letter to Defendants again attempting to exercise its right to a five-year renewal of the Vernon Leases. *Id.* at ¶ 32. Plaintiff's ability to renew the Vernon Leases without being required to renew all of its other leases is the core issue of this case.[3]

## II. PROCEDURAL HISTORY

Plaintiff filed its Complaint on November 11, 2016. D.E. 1. On December 28, 2016, Defendants filed a motion to dismiss based on failure to join an indispensable party (D.E. 12), to which Plaintiff filed a brief in opposition (D.E. 13), and Defendants filed a reply (D.E. 16). On February 6, 2017, Defendants filed a second motion to dismiss based on the *Brillhart-Wilton* abstention doctrine (D.E. 17), to which Plaintiff filed a brief in opposition (D.E. 20), and Plaintiff filed a reply (D.E. 22).

On January 18, 2017, a number of parties including Shotmeyer, Vernon, and Fersch House filed a lawsuit against Lukoil in New Jersey Superior Court (the "State Court Suit"). D.E. 17-3, Exhibit B ("State Court Compl."). The State Court Suit brings causes of action for (1) waste, breach, mismanagement and destruction of business, (2) promissory estoppel and detrimental reliance, (3) specific performance, (4) breach of contract, declaratory relief, and injunctive relief, (5) reformation, (6) declaratory relief and creation of a constructive trust. State Court Compl. at ¶¶ 41-78. A central issue in the State Court Suit is whether the 2005 Agreement allows Lukoil to renew leases at selected gas stations as opposed to all stations. The State Court Suit also raises other related issues, including the physical and economic condition of the stations. *See* State Court Compl. at ¶ 44. According to subsequent filings of the parties, the state court denied Plaintiff's

---

[3] The Court exercises jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332(a)(1).

motion to transfer the case from New Jersey's "Complex Commercial Litigation Program," consolidated the case with a related matter, and denied Plaintiff's motion to dismiss. *See* D.E. 23, 24, 29.

### III. LEGAL STANDARD

Defendants move to dismiss Plaintiff's Complaint based on the abstention doctrine originally described in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942) and further elucidated in *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). Pursuant to the *Brillhart-Wilton* doctrine, "when a federal suit is brought under the Federal Declaratory Judgments Act, presenting only questions of local laws, the court is under 'no compulsion to exercise [ ] jurisdiction' if a parallel state court proceeding would address the matters in controversy between the parties." *Marshall v. Lauriault*, 372 F.3d 175, 183 (3d Cir.2004) (quoting *Brillhart*, 316 U.S. at 495). The *Brillhart-Wilton* abstention is an exception to a court's general obligation to exercise jurisdiction because "[d]istinct features of the Declaratory Judgment Act . . . justify a standard vesting district courts with greater discretion in declaratory judgment actions." *Wilton*, 515 U.S. at 286.

Accordingly, "the Supreme Court announced that a district court acts within its discretion to stay or dismiss a declaratory judgment action 'where parallel proceedings, presenting opportunity for ventilation of the same state law issues, [are] underway in state court.'" *Evanston Ins. Co. v. Van Syoc Chartered*, 863 F. Supp. 2d 364, 368 (D.N.J. 2012) (quoting *Wilton*, 515 U.S. at 290); *Owen v. Hartford Ins. Co.*, 2014 WL 2737842, at *2 (D.N.J. June 17, 2014) ("Thus, under what is sometimes known as the *Brillhart-Wilton* abstention doctrine, district courts may dismiss, remand, or stay claims seeking declaratory relief, even though they have subject matter jurisdiction over such claims."). In *Brillhart*, the Supreme Court directed that in similar situations, district courts "should ascertain whether the questions in controversy between the parties to the federal

6

suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceeding pending in the state court." 316 U.S. at 495. Such an inquiry may require the district court "to consider whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding, whether necessary parties have been joined, whether such parties are amenable to process in that proceeding, etc." *Id.* The Third Circuit has cautioned, however, that "the mere existence of a related state court proceeding does not require a district court to decline to exercise jurisdiction under the DJA." *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 143 (3d Cir. 2014) (internal quotation omitted). The Third Circuit added additional factors, if relevant, for a court to consider in exercising its discretion:

> (1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy;
> (2) the convenience of the parties;
> (3) the public interest in settlement of the uncertainty of obligation;
> (4) the availability and relative convenience of other remedies;
> (5) a general policy of restraint when the same issues are pending in a state court;
> (6) avoidance of duplicative litigation;
> (7) prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for res judicata; and
> (8) (in the insurance context), an inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize that suit in federal court as falling within the scope of a policy exclusion."

*Reifer*, 751 F.3d at 146.[4]

The *Brillhart-Wilton* abstention doctrine, however, applies only to federal cases seeking declaratory relief. When legal relief is sought, then federal district courts have a "virtually unflagging obligation" to exercise jurisdiction. *Colorado River Water Conservation Dist. v.*

---

[4] The Third Circuit provides three additional factors to consider in insurance coverage cases. *See State Auto Ins. Companies v. Summy*, 234 F.3d 131, 134 (3d Cir. 2000), *as amended* (Jan. 30, 2001) (internal citation omitted). However, these factors do not apply to the facts of this case.

7

*United States*, 424 U.S. 800, 817 (1976); *see also Univ. of Maryland at Baltimore v. Peat Marwick Main & Co.*, 923 F.2d 265, 275–76 (3d Cir. 1991) ("The general rule regarding simultaneous litigation of similar issues in both state and federal courts is that both actions may proceed until one has come to judgment, at which point that judgment may create a res judicata or collateral estoppel effect on the other action."). In this case, Plaintiff seeks both a legal (or coercive) remedy (specific performance) as well declaratory relief. The Third Circuit recently ruled on the standard that governs in such situations.

In *Rarick v. Federated Serv. Ins. Co.*, 852 F.3d 223 (3d Cir. 2017), the Third Circuit adopted the "independent claim" test as the applicable standard to apply in cases with claims for both legal and declaratory relief.[5] Judge Hardiman, writing for the court held, in part, that

> After careful consideration of the various tests applied in [the circuits and district courts], we hold that the independent claim test is the most appropriate one. When a complaint contains claims for both legal and declaratory relief, a district court must determine whether the legal claims are independent of the declaratory claims. If the legal claims are independent, the court has a "virtually unflagging obligation" to hear those claims, subject of course to *Colorado River*'s exceptional circumstances. *Colo. River*, 424 U.S. at 817–19. If the legal claims are dependent on the declaratory claims, however, the court retains discretion to decline jurisdiction of the entire action, consistent with our decision in *Reifer*, 751 F.3d at 144–46.
>
> The independent claim test is superior to the others principally because it prevents plaintiffs from evading federal jurisdiction through artful pleading.

---

[5] The Court notes that the parties failed to inform the Court of the *Rarick* decision. The Third Circuit filed *Rarick* on March 28, 2017. Although the parties' initial briefing preceded *Rarick*, the parties filed numerous subsequent letters with the Court and never mentioned the *Rarick* case. *See* D.E. 25, 26, 27, 28, 29.

8

*Rarick*, 852 F.3d at 229. In other words, if a litigant's legal claims are dependent on their declaratory claims, then the district court has the discretion to decline jurisdiction over the claims.[6]

A number of district courts within the Third Circuit have since applied the "independent claim" test as *Rarick* dictates. *See, e.g.*, *Markel Ins. Co. v. Connolly, Connolly & Heun, LLP*, 2017 WL 4618750 (D.N.J. Oct. 16, 2017); *Griggs Rd., L.P. v. Selective Way Ins. Co. of Am.*, 2017 WL 2645542 (M.D. Pa. June 19, 2017); *Cont'l Cas. Co. v. Westfield Ins. Co.*, 2017 WL 1477136 (E.D. Pa. Apr. 24, 2017). "Under this test, the district court first determines whether claims seeking legal relief are independent of claims for declaratory relief." *Rarick*, 852 F.3d at 228 (citing *R.R. St. & Co., Inc. v. Vulcan Materials Co.*, 569 F.3d 711, 716–17 (7th Cir. 2009)). If the litigant's legal claims are dependent on the declaratory claims, then the court retains discretion under the DJA to decline jurisdiction based on application of the *Reifer* factors. *See Markel Ins. Co*, 2017 WL 4618750, at *3.

"[C]laims are independent of each other if and only if: 1) the district court would still have jurisdiction over the plaintiffs' claims that seek monetary relief if the declaratory claim were dropped from the case and 2) the requested declaratory relief is not a prerequisite to resolution of the monetary claims." *Cont'l Cas. Co. v. Westfield Ins. Co.*, 2017 WL 1477136, at *4 (E.D. Pa. Apr. 24, 2017) (citing *Vulcan Materials*, 569 F.3d at 717); *Rarick*, 852 F.3d at 228 (citing *Vulcan Materials*, 569 F.3d at 715). Legal claims must be able to "stand alone in federal court—*both jurisdictionally and substantively*—irrespective of the declaratory claim." *Vulcan Materials.*,

---

[6] In *Rarick*, the Third Circuit cites *R.R. St. & Co., Inc. v. Vulcan Materials Co.*, 569 F.3d 711 (7th Cir. 2009) when describing the "independent claim" test. *See Rarick*, 852 F.3d at 228. Therefore, to the extent that the "independent claim" is described in *Vulcan Materials*, this Court applies the Seventh Circuit's interpretation. *See Cont'l Cas. Co. v. Westfield Ins. Co.*, 2017 WL 1477136, at *3-5 (E.D. Pa. Apr. 24, 2017) (using *Vulcan Materials* as a guide in applying the "independent claim" test adopted in *Rarick*).

9

569 F.3d at 717 (emphasis added). Here, the Court finds that Plaintiff's claims are not substantively independent.

## IV. ANALYSIS

Defendants' second motion to dismiss argues that the Court should abstain from hearing, and should dismiss this case under the *Brillhart-Wilton* abstention doctrine. Defs. Abstention Br. at 7-11. Plaintiff responds that *Brillhart-Wilton* is inapplicable to this case because Plaintiff brings its declaratory judgment action alongside a "coercive" claim for specific performance. Pl. Abstention Br. at 8-15. Plaintiff alternatively argues that even if *Brillhart-Wilton* does apply, it does not support abstention in this case. Pl. Abstention Br. at 15-20.

### i. Jurisdictional Independence

Mixed claims are jurisdictionally independent "when they are alone sufficient to invoke the courts' subject matter jurisdiction." *Rarick*, 852 F.3d at 228; *Cont'l Cas. Co.*, 2017 WL 1477136, at *4. Here, Plaintiff's claims for specific performance and for declaratory relief are jurisdictionally independent because the Court would have jurisdiction of Plaintiff's specific performance claim independent of its claim for declaratory relief. Plaintiff has sufficiently pleaded the basis for diversity jurisdiction. Compl. at ¶¶ 5-8; 28 U.S.C. § 1332(a)(1).

### ii. Substantive Independence

Before discussing substantive independence, a closer review of the Vernon Leases and the 2005 Agreement is necessary. Overall, the parties agree that 44 leases are at issue: 43 for gas stations and 1 for the Vernon Lot. With the exception of one or two, all leases are set to expire in 2017 if not extended.

Plaintiff's position is that neither of the Vernon Leases (nor any other lease) expressly indicate that it is contingent on any other lease or the 2005 Agreement. Plaintiff further notes that

the leases permit Lukoil to unilaterally extend the term of the leases so long as it abides by the state notice requirement, which is 180 days for the Vernon Leases. Plaintiff adds that the leases contain provisions stating that the lease is fully integrated, meaning that the lease represents the complete understanding of the parties. Thus, Plaintiff concludes, individual leases can be renewed as Plaintiff determines even if Plaintiff decides that other leases are not to be renewed.

Defendants do not contest language of the leases. Instead, Defendants assert that the leases can only be read in light of the 2005 Agreement. According to Defendants, Plaintiff approached Shotmeyer in 2004, seeking to enter into an overarching agreement. Shotmeyer-related entities, rather than Shotmeyer actually own the land, on which the gas stations sit. Thus, as here, an individual LLP was established by Shotmeyer or Shotmeyer principals solely to own a specific gas station. Shotmeyer advises that this is a routine practice in the industry for liability purposes, particularly concerning environmental contamination. Shotmeyer continues that Plaintiff was well aware of this fact when it entered into the 2005 Agreement and that it was Plaintiff who proposed a packaged deal. Defendants concluded, therefore, that it was the intent of the parties as set forth in the 2005 Agreement that all leases would expire in 2017 unless all were renewed. Defendants claim that Plaintiff cannot "cherry-pick" the better-performing stations in piecemeal fashion.[7]

Plaintiff acknowledges the relationship between Shotmeyer and the related entities. Plaintiff's Complaint indicates that "[t]his action is about a landlord group that has leased 43 gasoline service stations, to one tenant[.]" Compl. at ¶1. Plaintiffs further acknowledge that the "Vernon Landlords are affiliates of" Shotmeyer." Id. at ¶3. The Complaint continues that "various

---

[7] Shotmeyer argues that Plaintiff is seeking to "cherry-pick" certain leases because Plaintiff has mismanaged its North America operations and has mismanaged numerous stations subject to the leases. As to mismanagement, Plaintiff asserts both fiscal failures and failure to keep the physical plant in proper order. The full panoply of Plaintiff's complaints are addressed in the State Court Suit.

11

affiliates of Shotmeyer are parties to the 44 separate lease agreements[.]" *Id.* at ¶ 26. The Complaint, however, does not mention the 2005 Agreement.

The 2005 Agreement permitted Getty, as "Buyer," to purchase certain assets of Shotmeyer, as "Seller," as well as lease certain stations from Shotmeyer. The agreement contemplated an initial period of 12 years, thereby expiring in 2017. The "Recitals" section of the 2005 Agreement provides as follows:

> A. Seller supplies motor fuels and lubricating oils, greases, or other products marketed by Seller to twenty-one (21) service station facility operators (the "Resellers") according to those certain agreements (the "Reseller Agreements") previously delivered to Buyer and listed with Resellers obligations payable in monthly increments to Seller with outstanding principal balances due as of April 1, 2005 and listed on Exhibit "A."
>
> B. Seller, through commission agents ("Commission Agents"), who have executed Commission Agreements ("Commission Agreements") operates sixteen (16) gasoline service station facilities (each, individually, a "Site" or collectively, the "Marketing Premises"). Each Site is identified with its address, term and current rent on Exhibit "A-1" attached hereto.
>
> C. Seller, or entities served by or related in some fashion to Seller, presently owns a fee interest in the real estate on which the Marketing Premises are situated.
>
> D. Concurrently, with the execution of this Agreement, the Buyer and the respective owners of the Marketing Premises will enter into individual Lease Agreements for each Site (the "Lease[s]") whereby such owners of the Marketing Premises, subject to the terms and conditions contained therein, have agreed to lease to Buyer (i) the lands upon which the Marketing Premises are located, and (ii) the Assets (as defined in Section 2.1 below).
>
> E. Buyer wishes to purchase Seller's interest in the Reseller Agreements and Seller's Inventory, UST Installation (as defined in Section 2.1 below) and related equipment as set forth in Exhibit "A-2", and Seller wishes to sell the same to Buyer on the terms and conditions set forth herein.

2005 Agreement §§ A-E.[8]

The "Recitals" section therefore indicates that referenced transactions are "consideration" for the 2005 Agreement. The section further refers to an overarching transaction concerning reselling agreements and property leases. As to ownership of the gas stations, the agreement further acknowledges that "Seller, *or entities served by or related in some fashion to Seller*, presently owns a fee interest in the real on which the Marketing Premises are situated." *Id.* Marketing Premises means the leased gas stations. Finally, the section clearly indicates that leases are to be entered "concurrently" with the signing of the 2005 Agreement.

Section 2.1 provides that "'*Assets' shall mean collectively Seller's interest* in all of the Facilities (as defined in the Lease)[.]" 2005 Agreement § 2.1. This definition can be interpreted to mean that the Buyer was viewing all of the leased premises as, effectively, Shotmeyer's. Section 2.4 refers to Exhibit C, which provides a form lease to be used for all of the covered properties. *Id.* § 2.4. Pursuant to Section 4, Shotmeyer agreed to deliver, among other things, the executed leases. *Id.* § 4. Finally, the 2005 Agreement also has an integration clause, which provides as follows:

> (a) <u>Entire Agreement</u>. This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating thereto. There are no agreements, representations, warranties, restrictions or undertakings other than those expressly set forth herein. This Agreement may not be amended or revised except by a writing signed by the parties hereto.

2005 Agreement § 11(a).[9]

---

[8] The Court notes that "Reseller" refers to service station facility operators who purchased products from Shotmeyer Bros.

[9] The Court notes that the 2005 Agreement includes a clause that states, in part, that "the sole jurisdiction for any disputes or litigation shall be in the Superior Court of New Jersey." 2005 Agreement, Section 11(d). However, Defendants do not raise this clause in their motions.

13

In light of the foregoing, Plaintiff's claims for specific performance and for declaratory relief are not substantively independent. Legal claims are substantively independent of declaratory actions "when they . . . can be adjudicated without the requested declaratory relief." *Rarick*, 852 F.3d at 228; *see Cont'l Cas. Co.*, 2017 WL 1477136, at *5. "[T]his test requires a court to adjudicate nondeclaratory claims if it determine[s] . . . there are claims in the case that exist independent of any request for purely declaratory relief, that is, claims that would continue to exist if the request for a declaration simply dropped from the case." *Vulcan Materials Co.*, 569 F.3d at 717 n.6 (internal quotations and citations omitted); *Cont'l Cas. Co.*, 2017 WL 1477136, at *5.

Here, Plaintiff's claim for specific performance requests that the Court "require the Vernon Landlords to honor [Plaintiff's] renewal of the Vernon Leases" in accordance with Plaintiff's interpretation of the contract – allowing Plaintiff to renew the Vernon leases without renewing other leases. Compl. at 11. Plaintiff's claim for declaratory relief requests that the Court "declar[e] that the renewal of the Vernon Leases is not in any way contingent on the renewal of any other leases." *Id.* These claims are substantively intertwined. Despite Plaintiff's contentions that this case is straightforward and clear cut, this case hinges on interpreting the 2005 Agreement. At a minimum, the 2005 Agreement creates an ambiguity as to the interaction between the 2005 Agreement and the individual leases, including the Vernon Leases. Given the language of the 2005 Agreement, Plaintiff has made a sufficient showing that the 2005 Agreement represents an overarching agreement (for 12 years) which impacts the interpretation of the leases. In order for this Court to grant Plaintiff's claim for specific performance, it would also be necessary to decide Plaintiff's claim for declaratory relief, that is, whether the 2005 Agreement requires that all leases to be renewed. Therefore, Plaintiff's claims are not substantively independent. *See Markel*, 2017 WL 4618750, at *3 (finding that a party's "declaratory and legal claims remain substantively

intertwined because adjudication of the state and common law claims against [a defendant] remains dependent on Plaintiff's sought declaratory relief").

### iii. *Reifer* Factors

Once a district court finds that mixed claims are either not jurisdictionally or not substantively independent, "a federal court should 'giv[e] meaningful consideration' to the relevant *Reifer* factors," *Markel*, 2017 WL 4618750, at *3 (quoting *Reifer*, 751 F.3d at 146), in order to "determin[e] whether to exercise DJA jurisdiction" under *Brillhart-Wilton*, *Reifer*, 751 F.3d at 146. While there are seven applicable *Reifer* factors here, *see supra* Section III.B., one of the most important considerations when considering the *Reifer* factors is whether there is "a substantial similarity in issues and parties between contemporaneously pending proceedings." *Kelly*, 868 F.3d at 284; *Markel*, 2017 WL 4618750, at *3 (finding that this is a "[p]aramount, although not dispositive" consideration "in this Court's analysis"); *Kelly v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 282 (3d Cir. 2017) (holding that "the existence of a parallel state proceeding militates significantly in favor of declining jurisdiction."). Here, the Court finds that the *Reifer* factors weigh in favor of abstaining under *Brillhart-Wilton* and staying Plaintiff's federal case pending the resolution of the State Court Suit.

The first *Reifer* factor is "[t]he likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the conduct." *Reifer*, 751 F.3d at 146. This factor weighs in favor of abstention. Here, even if this Court were to eventually rule on Plaintiff's declaratory judgment action, it would not resolve all of the issues pending in the State Court Suit – specifically, that Lukoil engaged in waste because it "mismanaged the stations in such a manner and to such an extent as to destroy their value. . . . with the result that the value of the gasoline business that Shotmeyer Bros. built over 75 years has been diminished by tens of millions of

dollars." State Court Compl. at ¶ 44. The State Court Suit also alleges that "Lukoil has made deleterious alterations to the physical plant of the station sites and failed to maintain them in good working condition and order." *Id.* Resolving Plaintiff's declaratory judgment action in federal court would not resolve these additional allegations.

The second *Reifer* factor is the "convenience of the parties." *Reifer*, 751 F.3d at 146. This factor also weighs in favor of abstention. As Defendants point out, all parties from this federal suit are present in the State Court Suit, with the addition of Shotmeyer Bros. Defs. Abstention Br. at 8. The State Court Suit provides the best opportunity for all potentially interested parties to resolve all of the disputes related to the 2005 Agreement.

Factors five, "[a] general policy of restraint when the same issues are pending in state court," and six, "[a]voidance of duplicative litigation" also weigh in favor of abstention. *Reifer*, 751 F.3d at 146. Here, while the State Court Suit does raise additional issues not raised in this federal case, all issues raised in the federal case are raised in the State Court Suit. The State Court Plaintiffs allege, in part, that

> Under the 2005 Agreement, Shotmeyer Bros. agreed to convey to Lukoil, and did convey, all of its gasoline business. *Lukoil has no right, under the agreement, to return to Shotmeyer Bros. some, but not all, of the conveyed business, retaining for itself select leased service station sites while abandoning sites whose value has been degraded if not destroyed by Lukoil's mismanagement of them. Shotmeyer Bros, in entering into the 2005 agreement, did not grant Lukoil a unilateral license to so cherry-pick the leased sites.* Under the 2005 Agreement, Lukoil has an obligation to return the subject stations in full compliance with all governmental requirements and in good condition and working order. Lukoil has disavowed and anticipatorily breached that obligation.

State Court Compl. at ¶¶ 58-59 (emphasis added). This issue, raised in the State Court Suit, is the fundamental issue raised in this federal suit.

In sum, Plaintiff's claims are not substantively independent and the *Reifer* factors weigh strongly towards abstention in this case. The Court finds that abstaining in this federal suit is consistent with "practicality and wise judicial administration," *Markel*, 2017 WL 4618750, at *4, as it allows all relevant parties to convene in one forum to resolve all of the issues related to the 2005 Agreement. It is for these reasons that the Court abstains from exercising jurisdiction over this case, and stays Plaintiff's causes of action in this Court pending the resolution of the State Court Suit.[10]

## V. CONCLUSION

In conclusion, Defendants' motion to dismiss under the *Brillhart-Wilton* abstention doctrine is **GRANTED** as to the Court's abstention although the Court will stay the matter rather than dismissing it. Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(7) and 19(a) based on Plaintiff's failure to join and indispensable party is **DENIED** as moot. The case will be stayed and administratively terminated pending the resolution of the State Court Suit. Upon resolution of the State Court Suit, the parties may write the Court seeking to re-open this federal case if appropriate. Should the State Court Suit reach a resolution which obviates the need to re-open the federal case, the parties shall notify the Court and this matter will be dismissed. An appropriate Order accompanies this opinion.

Dated: December 18, 2017

John Michael Vazquez, U.S.D.J.

---

[10] While Defendants moved to dismiss Plaintiff's Complaint, under *Brillhart-Wilton*, "district courts may dismiss, remand, or stay claims seeking declaratory relief, even though they have subject matter jurisdiction over such claims." *Owen v. Hartford Ins. Co.*, 2014 WL 2737842, at *2 (D.N.J. June 17, 2014).